22-3099 Colt Energy v. Southern Star Central Gas Pipeline. Would counsel for appellant make the appearance and then proceed, please. Yes, Your Honor, thank you. Lee Thompson, Wichita, appearing on behalf of Colt Energy and other interest owners in two oil leases in Kansas. We have appealed only from one facet of the order in summary judgment, and that was the claim for damages due to an intentional continuing nuisance to the migration of high-pressure storage in post-nuisance. The response to the summary judgment made clear that we were seeking a claim for damages which occurred as a result of a temporary nuisance within the two years prior to filing the lawsuit. And so that was a position stated clearly, I think, in response as it relates to damages. And the damages issue is probably the most significant, and so I will address that first. When the court held that there was no evidence of temporary damages, we had three components. One was whether there's evidence of damage sufficient to make a case for a claim of temporary nuisance. Second, whether there's a measure of temporary damages and whether it's made. The, of course, the basic law is that a claim for temporary nuisance is premised upon an unreasonable interference with the use and enjoyment of property. And our case and our response in summary judgment, I think, made clear that we were seeking damages for lost production of oil because the ability to produce oil was a diminishing probability due to the migration of forage gas. We listed a number of additional facts which decided that impact of the migration of storage gas. And that, among others, is that there was actual production before we acquired the lease. There was a substantial amount of oil to be delivered, and ultimately there was a blowout due to high pressure storage gas in November of 2017. And that then led to the question of how coal could continue to produce. So let me ask you a couple of questions. One is, is as to the two leases at issue in this case, was there production, were the wells on these two leases producing at the time your client acquired them? There was production in the years preceding when the wells were operated by the predecessor MAE. Okay, but when you, the wells were not producing when your client bought them, right? I think that's correct. And my client had experience in the field, whereas here there were older managers and they were able to increase and restore production, and that was about a reason for acquiring the leases. Okay, fair enough. But also, as far as that goes, your client allocated zero value to these leases when they purchased them as part of a package, right? Our client valued the entire package and based that on current production. Since there was no current production, that is correct, they assigned zero value, but they invested considerable money and time to rework the wells, which was the original intent. However, the problem came due to the physical impediments to producing food with high gas and steam. Well, let me ask you about that. So what is the evidence in the record before us, in the summary judgment record before the district court, that there was high pressure gas in these specific leases? And I'm not asking about offsetting leases or leases in the area, but with respect to these leases, because I think you would agree to me that there could be high pressure gas a thousand feet away from one of your wellbores and it wouldn't necessarily result in high pressure gas. Well, the district court found that there was, in fact, high pressure gas in the group lease based upon, A, measurements of very high pressure taken throughout the lease, and secondly, based upon the eruption of high pressure gas, which occurred in 2017 and subsequently another eruption of high pressure gas later in 2018. Right. But I guess my question is, was that evidence of high pressure gas, other than the district court's finding that there was high pressure gas in the rook lease, were the two blowouts on these leases or the instances of high pressure gas on these specific leases? Plus the measurements of high pressure gas taken on multiple wells throughout the rook lease. Can I ask you a question? One of the problems the district court has was the failure to provide sufficient evidence that the nuisance could eventually be abated and that production could resume and lack of evidence that would support that allegation for temporary damages. And then the damages calculation itself, as I read the expert report, the $7 million was the complete loss of use of the two leases. So in effect, as I read the district court order, there was not a calculation of damages related to a temporary nuisance that could be abated. Could you address that, please? First is the calculation of damages. The Butner expert report is a decline curve, which is a very common method of assessing the value of lost production, and it's based upon a yearly computation of the potential production that could occur. And indeed, the potential production was set out in various categories on a yearly basis, and that was evidence before the district court. Whether or not it was abatable, I think it's important to note that the issue is not whether it was currently being abated, but whether it was capable of being abated, which of course is a critical factor in ascertaining if it was a temporary or permanent damage. On this fact, the district court looked at a citation that there had been a recycling of boosters and lateral equipment at the time that Southern Star expanded the field. It included the swirl formation, and they said, well, that's no proof that it was being abated at the time of this case. But I think, A, it's proof that it is abatable, and that was submitted to the Federal Energy Reserve Commission. Why is that proof that it was abatable? Wasn't that 2008 that that information was submitted, and why does that provide any sort of genuine inference, a genuine dispute of fact, as it relates to the time of this dispute that it would be abatable, even if it would have shown that it was abatable in 2008? Because the process by which it is accomplished is simply installation of compressors to withdraw the inserted storage gas, and there's nothing uniquely temporal about that fact. That is, it's abatable and remediable, and that is abatable to Southern Star. In fact, that was the very basis that Southern Star sighed at the court when they sought to expand the field very tight in 2008, because it would enable them to recycle the gas from swirl formation into the common formation. Well, that may be self-evident, but was there anything in the record that would have made the connection between the 2008 evidence and the time of this dispute as it relates to the question of whether it was abatable or not? I think the record is limited to proof of what is the physical reality of the process, and that that was abatable and represented by Southern Star as being abatable in 2008, and there's no reason why that physical property and process was not abatable later. In fact, in a deposition testimony, I asked their management storage operations whether or not they were using the recycling facilities they had. No, they weren't. It had some problems with them, and generally, the booster compression worked, except when there were mechanical problems and it was down. Southern Star had controlled the gas through its booster station and could have done that. Well, let's talk about temporary damages again, and on the question of temporary damages, how do you square... The district court found the Butner report really actually showed permanent damages, and how do you square that with the Kansas Supreme Court's case of short versus wise in terms of how it determines that you evaluate this kind of damage, and whether it is, in fact, what would be the measure of damages in this situation? I think the measure of damages is the value of lost production, and so I understand the basic law in Kansas, it's either a reduction in long-term value or current useable value, and in this case, it's useable value, and that is set out in terms of production. We can't reduce it, we have to set it out in terms of production. And why is the district court's determination that the Butner report specifically, it says, is, quote, not an assessment of temporary damages. Why is that wrong? I know the bulletin says that, but I'm a district court. Page 101, volume 5 of the appendix, talking about the Butner report, it says, quote, this is not an assessment of temporary damages. It is an assessment of the total and permanent value of the untapped oil reserves on the Rook and Koch leases, period.  I think the fact is that the evidence in this report, and we're conflating kind of the measure with the amounts, and the amount of damages that we saw after the amendment to the complaint and the pretrial was limited to the two years, and there are specific numbers and loss of damages attributable to those two years in the report, and that can be given by the trial. It can be amended without any prejudice whatsoever. The underlying assumptions, his values, his discount rate were all accepted by the other side, and so those two years preceding this were specified in his report. His opinion ultimately went, as Your Honor said, to the total value. There is evidence, and that's the key of summary judgment, that we could present to the jury a fact issue of what the actual damages were in those two years. You may have said it and I didn't hear you, but what is your response to how does your, the Butner report and your corresponding argument associated with that square with the Kansas Supreme Court's decision in Short v. Wise? In that case, I have to be totally honest. All right. Counsel, let me jump in here for just a minute and ask you a question about damages. Just so the panel is clear on what your position is, is it your position that, I mean, you don't disagree that your expert report and calculations were for a permanent loss of the resource, right? Not a temporary loss. There were calculations of loss over a period of time. Well, it was assuming, let me stop you because we're running out of time, but the calculations were assuming that you were never going to produce the oil, correct? Under the current situation, yes. Okay, and so your position is that it was appropriate for you to create an issue of two years from that report to show that there were damages and that that would be, that would create a genuine issue of material fact? Yes, Your Honor. Okay, thank you. And that is the final thing for those two years. I don't think I have any more to talk about, so I appreciate the court letting us appear in this session today. Thank you. Thank you, counsel. Counsel for Apelli. Good morning, Your Honors. I'm Anaette Pease, the court. I'm standing with Your Honor, Bishop Sarkandos on behalf of the employees of our Star Central Gas Pipeline. There are three remaining matters in this appeal that I intend to focus my time on the issue of the temporary damages because that issue, unlike the other two issues, is fully dispositive of this matter. I don't think we need to get any farther. If I have time to do so, though, I will address the other two issues. Isn't the question of abatement itself, abatement or not, dispositive of this matter? Yes, Your Honor. The issue of abatement is dispositive of this issue tied into the question of abatement is a question of whether it can be done feasibly, whether it can be done at a reasonable cost. And then the third problem with the temporary damages question is whether or not plaintiffs have any evidence at all of a temporary damage relative to the butler report. Okay, and I'm just trying to understand analytically. I viewed, and this is where I want you to correct me if I'm wrong. I viewed analytically the question of whether you can prove a temporary nuisance. In other words, whether they can prove that this is an abatable nuisance in itself stands apart from the question of whether they can prove damages of a temporary nuisance. In other words, either ground is dispositive, is it not? Yes, Your Honor. Either is dispositive. If plaintiffs are not able to offer evidence that the nuisance is abatable, and again, tied into that being feasibly abatable, nor evidence, and separately, of their temporary damages, then yes, those issues are dispositive on any one of those wrongs. On the issue of the gas abatement question, what has really happened here is that plaintiffs have offered evidence, and offered only evidence, to the district court that conflates the idea of gas recovery with the idea of gas abatement. Those two are not the same question. There is evidence that, number one, is old. The evidence offered by plaintiffs, the only evidence offered, was of the later year 2008 FERC filing. That 2008 FERC filing was not arriving at the same question that is present before the plaintiffs as they are needing to prove abatement. So while the plaintiffs may have evidence from around 2008, it depends on which filing you're looking at, but generally in that time frame, that there is an ability to recover some gas. That is a different question entirely from whether or not particular gas located on the Roke Lease or the Coke Lease can be abated now in order to renew enough alleged gas to allow plaintiffs to then produce oil, and whether or not that can be done feasibly, within a reasonable cost. Let me ask, let me interrupt you for just a minute, and maybe you can answer this question. Is there, even if we accept the FERC application as being probative of something, is there evidence in the FERC application that high pressure gas on these specific leases could be remediated in a feasible manner? No, there is not. Okay, was the FERC filing a broader type of position by the appellee? Yes, it was. The FERC filing dealt with permission by Southern Star to obtain further rights, both laterally and vertically. There were discussions relative to the recovery system that was a part of that filing. I would point, Your Honor, yes, the answer is that that's not there, but even what is there, what these can point to, is not enough. So the actual citation that they pull out of that FERC filing to get to the question of abatement says that continued oil production can be a viable operation under recycling condition. Here, you're talking about, number one, continued oil production. The Rook lease and the Coke lease were not producing at the time that Plankus purchased the lease, and they were not producing at the time that this lawsuit was filed. The Rook stopped producing in 2016, and the Coke did not produce since 2017. That is not continued operation, number one. Number two, we've already discussed the temporal issue, whether or not the situation of the gas and whether it can be recovered at this time now, given 12 or more years of old continued oil production out of these formations, there are a host of questions that are absolutely unanswered by any of the evidence, and certainly unanswered by this FERC filing. The third reason that is, even this language says, can be a viable operation. This certainly doesn't raise to a level of the Plankus having anything to tell the jury, even if the FERC filing is what they have, that says it can, it is a viable operation. It more likely than not could be a viable operation for the Plankus to come in and produce oil on these leases. Finally, that FERC filing is a more general statement, as your Honor indicates. This, you're talking about a different segment of land, while the Rook lease is on the certificated boundary, the Coke lease is not. So whether or not those specific statements were being made relative to the Rook and the Coke lease, I think it is very unlikely, but in all honesty, I don't think anyone knows, because that wasn't the question that was in front of them as they were making those statements. So we get to, this is all that there was for the district court to say, I don't have the evidence of abatement here, and there just isn't the evidence of abatement. If this is all there is, this is not good enough, which is essentially where the district court ends up. On the issue of feasibility, which I call this effort on feasibility because it goes to the same issue, there is absolutely no evidence that Southern Star can do what Plankus are saying to abate any gas feasibly. There is no effort in the case on the Plankus side that indicates, on anyone's side, that indicates whether or not this recovery system, even assuming that it could abate any gas that was there that prevents the oil production, could be done feasibly. No person has given any evidence on that at all, and I think that again, completely leaves the plaintiffs with no evidence on abatement that can go forward to the jury. Finally, I'll move on from this particular issue, at least how I conceptualized it, to the question of cleanest evidence on temporary damages. This has been a bit of a circle to figure out exactly what damages Plankus were claiming. We did get a lot of it worked out in the summary judgment briefing. The case that we sort of went into at the bottom of the summary judgment and came out with after the briefing was finished, it invariably provided a significant amount of clarity as to what it is that Plankus were seeking. Procedurally, I will point out, this is, this was an integral part of our summary judgment briefing, and the plaintiffs did not respond to the issue of whether or not they had sufficient evidence of temporary damages. In the briefing, there was a reference that they were going to address it, that right after appeal also did not address this issue. I think that the issue of whether or not plaintiffs have temporary damages has now been waived, such that Murano should not consider it. But even on the merits, even getting to the merits of the question of whether or not plaintiffs have competent evidence of temporary damages, what they have is a report issue by their expert, Mr. Butler, in which he indicates that essentially, this is the portion of oil that exists that could be produced on the road lease and the co-lease, but for, and he assumes this, the production of gas on both leases. That, as we look at it in a temporary damages perspective, is not, because food needs to be available, is not an answer to a corrupt question. That is an answer to a permanent damages question. In fact, as it was presented in pretrial order, the $7.5 million damage claim was presented as past, present, and future damages. That aligns perfectly with what the case law would call permanent damages. Plaintiffs have now attempted to take what they have in Mr. Butler's report and turn it into a temporary damages, or at least come up with enough to make an argument to get to a jury. Problem is, number one, it wasn't disclosed that way, but really, the horror of it is that that's not what the opinion is, that's not what Mr. Butler did. But we're, I wish I could come up with a better analogy. This is the one in the briefs that I thought about, but I cannot. The question here is, on a temporary damages question, on a nuisance claim such as here, what are the damages or the inability of plaintiffs to produce oil in the two-year time frame? Not how much oil could have been produced, but what is the value of the damages or the delay in production? Because if, as they claim, it is available, they will eventually get to produce all of this oil, and a damage calculation that risingly falls on the amount of oil available to produce will necessarily lead to a double damage result. They do not have an expert that opines about the delay in damage, and again, the best analogy I can come to is this is not a crop case. This is not a case where there is a flood, but we've got two seasons of a wheat field that cannot produce wheat. Of course, we can go back, once the claim is evaded, we can decide, we can determine what the value of the use of that hay over two years was. This is not that at all. This is, after the gas is evaded under Plaintiff's theory, plaintiffs can then go ahead and produce all of that oil. That is what this redundancy report says. So as we look at what is in the record, there is no way, whether you slice it, dice it, how you've added those factors, whether there's any evidence to go to a jury on the actual temporary damage question. Let me just see if I can nail this down for in my own mind. The Butner report is saying X amount of oil is going to be lost and never be able to be produced, which would be a permanent damages type of argument, and your position is that in a temporary damages setting, the calculation is the difference in cash flows if you could have started producing it two years ago, as opposed to if you can start producing it now. Yes, that is essentially it. It requires more, I think, an economic opinion than anything else. I think we're going to take judicial notice of the fact that the price of oil moves around, and that certainly has been so in the last four or five years. So I think not only is there no evidence of damage related to the delay, we don't have an expert that tells us one way or the other, but I think it's perfectly possible that places producing oil now or producing oil in two years have a benefit of not producing it in a certain time frame. I mean, it could go either direction, but yes, Your Honor, that is essentially how that all comes together. I will raise the other two issues. These are not fully responsive, but the district court can tell me they were raising this appeal, the first of which is the question of the requirement of intent, and I think this argument essentially seems to be that once Senator Starr was aware of the fact, because of the knowledge of gas pressures, their lack of evading it then, of doing anything about it, then becomes the intention for it. I don't think that combines with Kansas law. We don't need to look any further than the Sanford case, which you might have already said, particularly the United Protein case, which I think is very helpful, in that United Protein looks very much like this case. It looks like a case that was worked up as a permanent damage of the case and worked up in a way that was intended to end up in a negligent situation. When the statute of the proposed prevented those arguments, the court came in and said, if you will not allow the creation of an intentional tort, I actually have to have precocious intent at the time and within the statute of limitations period, meaning there has to be- Let me interrupt you a second. Both of those cases involve a single episode, whereas the argument here is there are two blowouts. Why isn't there a pattern here when Southern Starr had some awareness of the potential problem in 2008 and then there was a blowout in 2017 and in 2021? Why is that not different than the two cases you mentioned, where what you had was only a single episode that did not provide the same predicate of notice? Let me answer that two ways. The first of which is that there is no evidence that the blowouts in this case were caused by any action of Southern Starr, and that is important. For an intentional tort, you need an act. The plaintiffs have never been clear on what the act was that was intentionally forcible that was committed by Southern Starr. There is evidence in the record that any migration of gas would not have been caused by Southern Starr, but caused by continued oil leakage. That's what the record says. The second piece of that is that there is no evidence that the blowouts were caused by high pressure gas. There are a lot of actual scenarios that can cause a well blowout. Plaintiffs don't have any evidence one way or the other about these particular blowouts. All they have is evidence in the record that the blowouts occurred. And then finally, and maybe more directly to your question, the lack of ability for the turning of an intentional tort into something that doesn't require intent would mean that you needed an act. So if the situation is, and I would submit to the court that it is, that the blowout happened, and that a second blowout happened, then assuming that those two things happened because of high pressure gas, you still need something that Southern Starr did. If those two blowouts happened because of circumstance, because this was set in motion, what would need to be done, that wouldn't rise to the level of an intentional blowout. Well, if there were two instances of blowouts that were associated, we're talking for the moment, let's assume hypothetically, two instances of blowouts that were caused by high pressure gas, and that Southern Starr is involved in and knows of the migration of high pressure gas, whether they caused the two blowouts or not, why doesn't that be held to be responsible for it? They're on notice that this kind of problem occurs, they have seen concrete instances of it occurring, whether they caused it or not, and then they continue to do what they're doing. Why isn't that a problem? And the question there, the reason is they continue to do what they're doing. What is the evidence of what they're doing? They have a storage field, they're allowed to put high pressure gas into that storage field. How, the real question of that question is, have they done anything that is torture related to their storing of gas in the storage field? Well, if those two prior instances ramp up the level of substantial certainty that if they don't take mitigative evasive action relative to their storage of high pressure gas, that there will be another blowout or there will be damage, why aren't they going to be held responsible for that? I'm talking the level of substantial certainty that would occur such that there would be an intentional tort. Let me make sure. Does the Annenberg case require that time of reaction is when the intentional mental status has to arrive? If you can't act in one year and then have things happen many years later, it didn't have the extent of the time the action was taken. So I think that's the first answer. The second is that that may well be a situation where there is a tort that applies. It's just not an intentional tort. Maybe that's a medical genetic, but it's not an intentional tort if it doesn't necessarily have that thought process at the time of an action, not of an inaction. All right. Counsel for Appellant, I've probably run over through my peppering of questions. And so if you want a minute, you have it. If not, we'll consider the case submitted. You don't have to take it. I'll try the minute, Your Honor. The need for some act is clearly established by the proof that the insertion of high-pressure storage gas led originally to the migration into the uproot formation, not just oil producers as suggested by Ms. Wood. And there's a lot of expert testimony on that. And so that high-pressure is continually present in the storage field, and there's no other source of the high-pressure. And we cite in our expert testimony from our own expert as to the problems created by the migration of storage gas. And I think that is clearly the intentional tort. Thank you, Your Honor. Case is submitted.